# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| VERNITA M. MURDOCK, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:10-CV-00056 |
| | § | |
| CITY OF HOUSTON and ARAMARK | § | |
| SPORTS FACILITIES, L.L.C., | § | |
| *Defendants.* | § | |

## MEMORANDUM AND RECOMMENDATION

This Title VII harassment case is before the court on summary judgment motions by defendants City of Houston (Dkt. 18) and Aramark Sports Facilities, L.L.C. (Dkt. 17). The court recommends that the City's motion be granted, and Aramark's motion be denied.

### Background[1]

The City of Houston has contracted with Aramark Sports Facilities, L.L.C. for janitorial services at the City's George R. Brown Convention Center.[2] On May 16, 2007, Vernita M. Murdock began working for Aramark as a housekeeping event staff employee at

---

[1] The following facts are assumed as true for purposes of these motions only. The court will draw, as it must, all inferences arising from the facts in the light most favorable to the nonmoving party. *Hotard v. State Farm Fire & Cas. Co.*, 286 F.3d 814, 817 (5th Cir. 2002).

[2] *See* Dkt. 18-3, at 4–9.

the convention center.[3] Her duties were to assist in preparing and cleaning the exhibit halls for various events.[4]

Murdock had multiple supervisors. Her immediate supervisor was Vanessa Hernandez, an Aramark manager who interviewed Murdock for the position. Murdock testified that Albert Evans, a City employee, also acted as her supervisor by giving her assignments and telling her what to do.[5]

On Murdock's first day of employment, Evans touched his private parts while talking to her. Murdock told her sister, Linda Mitchell, an Aramark employee who answers the phones at the customer service representative (CSR) office about Evans's conduct. Murdock then went to Vanessa Hernandez's office to complain, but when she knocked on the door, no one answered.[6]

On her second day, Evans called Murdock "Babe" while they were putting down tape for exhibit booths. She tried calling Hernandez's office phone, but the number automatically routed to the front desk of the CSR office where her sister works. Murdock complained to

---

[3]    Dkt. 23-2, at 2.

[4]    McConnell Aff. ¶ 2 (Dkt. 17-4); Murdock Depo. 206. Portions of Murdock's deposition can be found as exhibits to Aramark's and the City's motions, and Murdock's responses. *See* Dkts. 17-3; 18-1; 23-1; 24-1.

[5]    Murdock Depo. 45-46, 55-56, 83, 109, 124, 281-83.  On one occasion, Evans purported to fire another employee, Sherrod Williams, in Murdock's presence. *Id.* 129-30.  Although Murdock did not believe Evans, as a City employee, had authority to fire Aramark employees, she did believe that he could influence Hernandez to fire her. *Id.* 286-87.

[6]    *Id.* 57–60.

her sister about the "Babe" reference, and Mitchell responded that Evans referred to all women that way. Hernandez was unavailable when Murdock called, and was still out of the office when Murdock tried calling again at 1:00 pm that day.[7]

On the third day, Evans again groped his private parts while telling Murdock about the things he did and bought for former female employees. He also invited Murdock to lunch with him and Carlton Thompson (an Aramark crew leader), but Murdock declined. Murdock tried calling Hernandez again, and Laura Nunez answered the phone at the CSR office front desk. Murdock told Nunez that she needed to talk to Hernandez about sexual harassment. Nunez told her that Hernandez was out to lunch and would be back at 1:00 pm. Murdock did not hear back from Hernandez that day.[8]

On the fourth day, Evans again groped himself while talking to Murdock. Murdock went to Hernandez' office to complain, but although Hernandez was in she did not answer the door.[9] Murdock proceeded to ask an unknown police officer at the convention center how to go about filing a harassment complaint. The officer responded that she had to call "the City people" to file a complaint. Murdock did not on that day file a complaint with the City.[10]

---

[7]     *Id.* 61-63, 68-69.

[8]     *Id.* 71-77.

[9]     *Id.* 77–79. Murdock later testified that Hernandez did not answer the door because she was "messing around" with Tim in her office. *Id.* 175–176.

[10]    *Id.* 80-82.

On the fifth day of Murdock's employment, Evans again flicked at his pants while talking to her.[11] Later, while Evans walked with Murdock to a job site, Evans pulled her over and hugged her against her will.[12]

Around the end of August 2007, Murdock was sitting on a bench scratching her legs with her pant legs up, when Evans drove up in his cart and told her, "I sure seen your big old pretty brown legs. I sure would like to get between your legs."[13] On a different day around the same time, Evans saw Murdock walking to work and gave her a ride. While they were in the car, Evans again asked Murdock to have lunch with him and Thompson.[14] On another occasion, Evans asked Murdock if she needed any money, because he would give her money if she "wante[ed] to be with" him. She understood he was propositioning her for sex.[15]

Finally, in late August or early September 2007, Murdock looked up the City in the phone book, and spoke to the Houston Police Department's Office of Inspector General about Evans's conduct.[16] On September 18, 2007, a representative from that office informed Susan McConnell (Aramark's Human Resources Manager) about Murdock's allegations and

---

[11]     *Id.* 82.

[12]     *Id.* 88-90.

[13]     *Id.* 113–114.

[14]     *Id.* 114-17.

[15]     *Id.* 120-21.

[16]     *Id.* 111–114, 124; Dkt. 23-2, at 2–3.

said the City would investigate the claims.[17] Hernandez placed Murdock on paid leave pending an investigation into her allegations.[18]

Shortly thereafter, Hernandez and McConnell met with Murdock to discuss her allegations.[19] On October 3, 2007, Murdock accepted reassignment to the morning shift to work under Carmen Guerra.[20] The record reflects no allegations of harassment after that date. On October 11, 2007, the City informed Murdock that it did not have sufficient evidence to substantiate her harassment allegations.[21]

On December 17, 2007, Murdock filed a charge of discrimination with the Texas Workforce Commission.[22] On September 3, 2009, the Equal Employment Opportunity Commission found unlawful discrimination by Aramark, and liability on the City's part as a joint employer.[23] On January 6, 2010, Murdock sued the City and Aramark for hostile-environment-type harassment under Title VII of the Civil Rights Act of 1964.[24] The City and Aramark seek summary judgment.

---

[17] McConnell Aff. ¶¶ 1, 5.

[18] Murdock Depo. 141.

[19] McConnell Aff. ¶ 6.

[20] *Id.*; Murdock Depo. 99, 108-09, 144-45.

[21] Dkts. 17-5, at 8; 18-2, at 36.

[22] Dkts. 17-1; 18-2, at 38.

[23] *See* Dkt. 23-2.

[24] Murdock is not asserting any claim based on her termination. Dkt. 23, at 1–2.

## Summary Judgment Standard

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" and therefore judgment is appropriate as a matter of law. Fed. R. Civ. P. 56(c). A dispute is "genuine" if the evidence could lead a reasonable jury to find for the non-movant. *In re Segerstrom*, 247 F.3d 218, 223 (5th Cir. 2001). "An issue is material if its resolution could affect the outcome of the action." *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 310 (5th Cir. 2002). The movant has the initial burden to prove there are no genuine issues of material fact for trial. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). If the movant satisfies its burden, "the non-movant must identify specific evidence in the summary judgment record demonstrating that there is a material fact issue concerning the essential elements of its case for which it will bear the burden of proof at trial." *Douglass v. U. S. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996).

## Analysis

**1.    The City's Motion for Summary Judgment**

The parties agree that Murdock was employed by Aramark, a food service contractor for the City of Houston at the George R. Brown Convention Center. Murdock contends that she was jointly employed by the  City, alleging that City employees supervised her work, and

that the City had authority over Murdock's employment and retention.[25]  The City moves for summary judgment on the grounds that as a matter of law, a government subdivision cannot be a joint employer with a private entity; and that as a matter of fact, it did not control Murdock's employment.[26]

Murdock has offered sufficient evidence to create a genuine issue of material fact on whether the City exerted significant control over her employment.[27] However, an unpublished decision of the Fifth Circuit (cited by neither party) does hold that as a matter of law the joint employer doctrine is not applicable to government subdivisions. *Karagounis v. University of Texas Health Science Center at San Antonio*, 1999 WL 25015 (5th Cir. 1999) ( *per curiam*). This unpublished decision is not binding precedent under the Fifth Circuit's own rules,[28] and for reasons explained below a future panel of that court might easily be

---

[25]     *See* Complaint ¶ 6 (Dkt. 1).

[26]     The City's motion also joins Aramark in seeking summary judgment on the ground that the conduct complained of was not severe or pervasive enough to constitute actionable sexual harassment under Title VII. For reasons explained in section 2, *infra*, that argument is rejected.

[27]     The contract provides the City the ability to request that an Aramark employee not be assigned to work in a City facility. Affidavit of Stephen W. Lewis ¶ 7 (Dkt. 18-3). There was also conflicting evidence regarding Evans's ability to hire and fire Aramark employees. Murdock recounted one instance where Evans allegedly fired and subsequently rehired Sherrod Williams, an Aramark employee in a similar position to Murdock, and another instance where he allegedly threatened to fire her if he caught her talking to Williams. *See supra* n.5; Murdock depo. 205-06. Finally,  Murdock repeatedly testified that she worked directly under Evans, and that Evans instructed her daily as to her work assignments. *See supra* n.5.

[28]     5TH CIR. R. 47.5.4 ("Unpublished opinions issued on or after January 1, 1996, are not
                                                                                          (continued...)

persuaded to reach a contrary result. But until that day arrives, this lower court bows to the unambiguous holding of our court of appeals, and recommends that summary judgment be granted to the City on that basis.

Liability under Title VII hinges on the employment relationship. Because the Act's definitions of "employer" and "employee" are famously circular,[29] courts have looked to other sources to decide employer/employee status. In the Fifth Circuit, the basic test for deciding whether an employment relationship exists between a worker and his putative employer is the "hybrid economic realities/common law control" test. *Mares v. Marsh*, 777 F.2d 1066, 1067–68 (5th Cir. 1985); *see also Deal v. State Farm County Mut. Ins. Co. of Texas*, 5 F.3d 117, 119 (5th Cir. 1993); *Fields v. Hallsville Indep. Sch. Dist.*, 906 F.2d 1017, 1019 (5th Cir. 1990). The right to control an employee's conduct is the most important component, focusing on the putative employer's right to hire, fire, supervise, and schedule the work. The economic realities component focuses on whether the alleged employer signed the paycheck, withheld taxes, provided benefits, and set terms and conditions of employment. *Deal*, 5 F.3d at 119. There is no dispute here that Murdock was employed by Aramark.

That does not end the inquiry however. Nothing in Title VII precludes the possibility that an employee may simultaneously be employed by another employer. The concept of joint

---

[28]     (...continued)
         precedent, except under the doctrine of res judicata, collateral estoppel or law of the case . . .").

[29]     *See* 42 U.S.C. 2000e(b)(employer definition); 2000e(f)(employee definition).

or multiple employers is not novel, and has long been a staple of labor relations law. *See Boire v. Greyhound Corp.,* 376 U.S. 473, 481 (1964); *NLRB v. Pennsylvania Greyhound Lines, Inc.,* 303 U.S. 261 (1938) ("Together, respondents [affiliated corporations] act as *employers* of those employees . . . and together actively deal with labor relations of those employees." (emphasis added)); *NLRB v. Condenser Corp. of America,* 128 F.2d. 67, 72 (3d Cir. 1942) ("It is rather a matter of determining which of two, *or whether both,* respondents control, in the capacity of employer, the labor relations of a given group of workers." (emphasis added)). The existence of joint employer status is "essentially a factual issue," and hinges on whether the putative employer "possesse[s] sufficient control over the work of the employees to qualify as a joint employer." *Boire,* 376 U.S. at 481.

The Fifth Circuit follows the NLRB's standard for determining joint employer status: whether the two entities "share or co-determine those matters governing essential terms and conditions of employment." *Texas World Service Co. v. NLRB,* 928 F.2d 1426, 1432 (5th Cir. 1991); *NLRB v. Greyhound Corp.,* 368 F.2d 778, 780 (5th Cir. 1966). As is often the case with legal principles developed under the NLRA, the joint employers doctrine has been applied in the employment discrimination setting. *See Turner v. Baylor Richardson Med. Ctr.,* 476 F.3d 337, 344-45 (5th Cir. 2007); *Virgo v. Riviera Beach Assocs., Ltd.,* 30 F.3d 1350 (11th Cir. 1994); *Boutin v. Exxon Mobil Corp.*, 730 F. Supp. 2d 660, 680 (S.D. Tex. 2010).

The joint employers doctrine is often confused with a related, but quite distinct, legal doctrine known as the "single employer" or "integrated enterprise" theory. *See* John E. Higgins, Jr., The Developing Labor Law, vol. II, at 2247 (5th ed. 2006). The integrated enterprise doctrine also originated in labor relations law, primarily as a way of determining whether related business entities, such a parent and a subsidiary, should be considered together as a single statutory employer for jurisdictional purposes. In *Radio Union v. Broadcast Service of Mobile, Inc.,* 380 U.S. 255, 256 (1965), the Supreme Court upheld NLRB jurisdiction over a Mobile radio station, even though the station's gross revenues were below the Board's jurisdictional minimum of $100,000, because the station was "an integral part of a group of radio stations owned and operated by [a parent company] and . . . the annual receipts of the common enterprise are in excess of $100,000." The Court endorsed the Board's practice of "consider[ing] several nominally separate business entities to be a single employer where they comprise an integrated enterprise," and approved the Board's four-factor test:  (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership. *Id.* The integrated enterprise doctrine has also been employed by the Fifth Circuit in the employment discrimination context, using the same four *Radio Union* criteria. *See, e.g., Schweitzer v. Advanced Telemarketing Corp.*, 104 F.3d 761, 764 (5th Cir. 1997) (ADEA); *Trevino v. Celanese Corp.,* 701 F.2d 397,  404 (5th Cir. 1983) (Title VII).

10

The most definitive explanation of the differences between these two doctrines was given by the Third Circuit in *NLRB v. Browning-Ferris Industries of Pennsylvania, Inc.*:

> The "joint employer" and "single employer" concepts are distinct. Admittedly, there has been a blurring of these concepts at times by some courts and by the Board. However, as the Supreme Court itself has recognized, the two concepts approach the issue of "who is the employer," from two different viewpoints.
>
> \*          \*          \*
>
> A "single employer" relationship exists where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a "single employer." The question in the "single employer" situation, then, is whether the two nominally independent enterprises, in reality, constitute only *one integrated enterprise.*
>
> \*          \*          \*
>
> In contrast, the "joint employer" concept does not depend upon the existence of a single integrated enterprise and therefore the above-mentioned four factor standard is inapposite. Rather, a finding that companies are "joint employers" assumes in the first instance that companies are "what they appear to be"- independent legal entities that have merely "historically chosen to handle jointly ... important aspects of their employer-employee relationship." *NLRB v. Checker Cab Co.*, 367 F.2d 692, 698 (6th Cir. 1966).
>
> In "joint employer" situations no finding of a lack of arm's length transaction or unity of control or ownership is required, as in "single employer" cases. . . . The basis of the finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. *Walter B. Cooke,* 262 NLRB No. 74 (1982) (slip op. at 31). Thus, the "joint employer" concept recognizes that the business entities involved are in fact separate but that they *share* or co-determine those matters governing the essential terms and conditions of employment. *C.R. Adams Trucking, Inc.,* 262 NLRB No. 67 (June 30, 1982) (slip op. at 5); *Ref-Chem Co. v. NLRB,* 418 F.2d 127, 129 (5th Cir. 1969); *NLRB v. Greyhound Corp.,* 368 F.2d 778, 780 (5th Cir. 1966).

*       *       *

> [W]e are satisfied that the appropriate standard for determining "joint
> employer" status is to be found in the Supreme Court's *Boire* opinion, and that
> the appropriate standard for determining "single employer" status is to be
> found in the Supreme Court's *Radio Union* opinion. Not only do these
> standards carry out the purpose of the NLRA, but they are logical and
> functional.

691 F.2d 1117, 1122-24 (3d Cir. 1982). *See also Texas World Service Co. v. NLRB,* 928 F.2d

1426, 1432 (5th Cir. 1991) (citing *Browning-Ferris* with approval).

Murdock's complaint clearly invokes the joint employers doctrine.[30] The City's

motion for summary judgment confuses the joint employer test with the *Trevino* single

employer test, and then attacks on the ground that *Trevino* is not applicable to government

subdivisions, citing *Turner v. Baylor Richardson Medical Center,* 476 F.3d 337, 344 (5th

Cir. 2007).[31]

*Turner* was a Title VII case brought by a black female against Richardson Hospital

Authority, a state agency, and Richardson Medical Center Foundation, a non-profit

corporation. Affirming summary judgment, the Fifth Circuit did in fact hold that "a

government employer, such as RHA, may not be considered part of an integrated enterprise

under the *Trevino* framework." *Id.* at 344. However, the *Turner* opinion went on to consider

separately whether the trial court had erred by failing to consider plaintiff's joint employer

theory of liability, which was not raised until her motion for new trial. The Court again

---

[30]    Complaint ¶ 6.

[31]    Dkt. 18, at 10.

affirmed the trial court, but not on the same ground as the single employer claim. Instead, the Court ruled that Turner had waived the joint employer claim based on the settled rule that a motion for new trial "cannot be used to argue a case under a new legal theory." *Id.* at 344-45 (citing *Simon v. United States,* 891 F.2d 1154, 1159 (5th Cir. 1990)). Alternatively, the Court held that the joint employer argument "clearly lacks merit, as Turner has made no showing that the Foundation retained for itself sufficient control of the terms and conditions of [Turner's] employment." *Id.* at 345 (citing *Virgo v. Riviera Beach Assocs., Ltd.,* 30 F.3d 1350, 1360 (11th Cir. 1994) (internal quotes omitted)).

On its face, *Turner* does not support the City's argument that the joint employer doctrine cannot be applied to governmental subdivisions. Instead, *Turner* explicitly recognizes that the integrated enterprise and joint employer tests are legally distinct, and disposed of the two claims on legally distinct grounds. If the *Turner* court had felt that the governmental subdivision exception applied equally to both single employer and joint employer claims, it missed a golden opportunity to say so.

Nevertheless, as noted above, there is one unpublished Fifth Circuit decision that does say so. *Karagounis v. University of Texas Health Science Center at San Antonio*, No. 97-50587, 1999 WL 25015 (5th Cir. 1999). After observing that "the core analysis of these two inquires [*sic*] are [*sic*] virtually identical," the *Karagounis* opinion declares:

> Given the similarities between the two, we are constrained by *Trevino* to hold that the governmental subdivision rule we applied within the single employer doctrine also applies to the joint employer theory. To hold otherwise would,

13

in effect, allow an end run around the precedent we established in *Dumas* and *Trevino*.

Id. at *2.

This decision is not binding on any other panel of the Fifth Circuit, and its persuasive value may well be questioned. First of all, the core inquiries of the two theories are not the same, and actually point in different directions: the integrated enterprise test asks whether control over labor relations is "centralized" in a single entity, while the joint employer test asks whether that control is "shared or co-determined" by two or more entities. Moreover, the integrated enterprise test examines the overall business relationship between two or more nominally separate corporate entities, including ownership structure, management, and operations. Such questions commonly arise in the context of parent and subsidiary corporations, where the temptation to avoid statutory employment duties by manipulating corporate organization may arise. *See Papa v. Katy Indus., Inc.*, 166 F.3d 937, 940-42 (7th Cir. 1999).

Nor was the holding in *Karagounis* inevitably foreordained by the two Fifth Circuit cases it cited. In *Dumas v. Town of Mt. Vernon*, the Fifth Circuit declined to apply the single employer theory to aggregate the town with the county and state for purposes of calculating the number of employees for Title VII jurisdiction. 612 F.2d 974, 979 n.9 (5th Cir. 1980). No rationale was offered for the ruling.[32] A few years later, the *Trevino* court commented on

---

[32]    Although one is not difficult to imagine, since a contrary ruling would make every governmental agency, no matter how small, a statutory employer under Title VII.

*Dumas* in a footnote by observing that the integrated enterprise standard "is not readily applicable to governmental subdivisions." *Trevino,* 701 F.2d at 404 n. 10.  But this observation seems little more than self-evident *dicta*:  self-evident, because some of the elements of the single employer standard – notably common ownership – are plainly directed to private enterprise; and *dicta*, because none of the parties in *Trevino* were governmental actors.

Writing on a clean slate, this court would be inclined to reject the City's argument, because no cogent reason has been offered why a government entity, like any general contractor, could not share or co-determine with a private sub-contractor the control over an employee's work. Given the express, considered ruling of the Fifth Circuit to the contrary, however, the court is constrained to recommend that the City's motion be granted on the grounds that the joint employer theory of liability does not apply to government subdivisions.

**2.    Aramark's Motion for Summary Judgment**

A plaintiff asserting a hostile environment harassment claim under Title VII must plead and prove the following elements:

(1) The employee belongs to a protected group;

(2) The employee was subject to unwelcome sexual harassment;

(3) The harassment complained of was based upon sex;

(4) The harassment complained of affected a "term, condition or privilege of employment; and

(5) the employer knew or should have known of the harassment in

question and failed to take prompt remedial action.

*Jones v. Flagship Int'l*, 793 F.2d 714, 719–20 (5th Cir. 1986).[33] Aramark moves for summary

judgment on the grounds that (a) the harassment at issue was neither severe or pervasive, and

(b) it took prompt remedial action.

**Severe or pervasive harassment.** In order to be actionable, the alleged harassment

"must be sufficiently severe or pervasive to alter the conditions of the victim's employment

and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21

(1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). The conduct

must be objectively severe or pervasive enough to create an environment that a reasonable

person would find hostile or abusive. *Id.* Moreover, the plaintiff must "subjectively perceive

the environment to be abusive." *Id.* at 21–22. In determining whether the alleged harassment

is sufficiently severe or pervasive, courts consider "the totality of the circumstances including

'the frequency of the discriminatory conduct; its severity; whether it is physically threatening

or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

---

[33]     Because the alleged harasser (Evans) was not employed by Aramark, the *Faragher/Ellerth*
modifications to the liability standard do not apply. "[E]mployees bringing a Title VII sexual
harassment case alleging that a supervisor with immediate (or successively higher) authority
over the employee harassed the employee need only satisfy the first four elements of the test
outlined above. Once the plaintiff employee makes this showing, an 'employer is subject to
vicarious liability to a victimized employee.'" *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th
Cir. 1999) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)).

employee's work performance.'" *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005) (quoting *Harris*, 510 U.S. at 23).

Murdock complains of the following acts, all of which occurred in a brief 3-month period: (1) beginning on the first day of Murdock's employment, and on numerous occasions thereafter, Evans groped at his groin when he talked to her; (2) Evans forcibly hugged Murdock; (3) Evans threatened to terminate Murdock; (4) Evans told Murdock "[he] would like to get between [her] legs"; (5) Evans told Murdock that he would give her money if she "wanted to be with" him; (6) Evans told Murdock about things he did and bought for former female employees; (7) Evans called Murdock "Babe"; and (8) Evans twice asked Murdock to lunch. Although many of these acts allegedly occurred only once, Evans's groin groping occurred repeatedly.[34]

A few of Evans's statements were humiliating. For example, twice Evans made strong verbal sexual advances, telling Murdock he "would like to get between [her] legs," and that he would give her money to if she "wanted to be with" him. Also, although Evans did not threaten Murdock with bodily injury, Evans once pulled on her shirt to get her close to him so that he could forcibly hug her against her will. Finally, the summary judgment evidence indicates that on July 3, 2007, Murdock missed work due to the stress of dealing with Evans.[35]

---

[34]     Murdock Depo. 72–73.

[35]     *Id.* 85–86; Dkt. 17-4, at 15.

Aramark, citing *Shepherd v. Comptroller of Public Accounts of the State of Texas*, 168 F.3d 871 (5th Cir. 1999) and *Hockman v. Westward Communications, LLC*, 407 F.3d 317 (5th Cir. 2004), argues that the Fifth Circuit has found that equally offensive conduct was not sufficiently severe or pervasive to create an abusive working environment. In *Shepherd*, the alleged harasser once remarked on the plaintiff's nipples, once commented on her thighs while pretending to look under her dress, several times attempted to look down her dress, touched her arm and once rubbed her arm, and twice motioned to his lap saying "here's your seat." 168 F.3d at 872. In *Hockman*, the alleged harasser commented to the plaintiff on another woman's figure, brushed up against her breasts and behind, once slapped her behind with a newspaper, once attempted to kiss plaintiff, more than once asked her to come in early so they would be alone, and once stood in the doorway of the ladies restroom while plaintiff was washing her hands. 407 F.3d at 321-22.

It is true that the harassment in those cases is comparable to what Murdock alleges here, in terms of the overall number of incidents and their relative severity. What sets Murdock's case apart is the relative *frequency* of those incidents. The conduct in *Shepherd* and *Hockman* occurred over a span of two years and eighteen months, respectively. Murdock experienced a similar number of harassing incidents over 3 months, a far more concentrated period of time. Indeed, the frequency of Evans's harassment of Murdock was six times greater than in *Hockman*, and eight times greater than in *Shepherd*. Given this significant disparity in frequency, those cases are not controlling here.

18

Considering these factors, especially the frequency of the harassment, the summary judgment evidence gives rise to a fact issue whether the harassment affected a term, condition, or privilege of Murdock's employment.  Aramark is not entitled to summary judgment on this ground.

**Prompt remedial action.** To hold an employer liable for harassment by a non-employee, the plaintiff must prove the employer's negligence—that "the employer (or its agents or supervisory employees) [knew] or should have known of the conduct and fail[ed] to take immediate and appropriate corrective action." 29 C.F.R. § 1604.11; *Frank v. Harris County*, 118 F. App'x 799, 803 (5th Cir. 2004). Aramark argues that it took prompt remedial action by reassigning Murdock to a new position on October 3, 2007, approximately two weeks after learning of Murdock's complaint via City personnel.  Murdock responds that the timeliness of the remedial action should be measured from the first day of her employment in May, when Murdock first attempted unsuccessfully to complain to her supervisor.  Based on that four month delay, Murdock argues that there is a jury question on this issue.

The Fifth Circuit has held that as a matter of law, an employer does not fail to take immediate and appropriate corrective action if the employee unreasonably fails to take advantage of corrective opportunities provided by an employer. *See Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 437 (5th Cir. 2005); *Hockman v. Westward Communications, LLC*, 407 F.3d 329 (5th Cir. 2004).

*Harvill* and *Hockman* are not controlling here. In those cases, the plaintiffs were given an employee handbook containing the employer's anti-harassment policy. The policy stated that if a harassment allegation is not resolved satisfactorily after an employee reports the incident to her immediate supervisor, the employee should report the incident to the human resources department. Both Harvill and Hockman signed an acknowledgment that they received the handbook, and that they were responsible to read and be familiar with its contents. Harvill and Hockman reported incidents of harassment to their immediate supervisor, but the harassment continued. Months later, their attorney sent a letter to the human resources department (among other recipients), at which point the harassment stopped. The Fifth Circuit held in *Harvill* and *Hockman* that the plaintiffs unreasonably failed to take advantage of corrective opportunities provided by their employer because they did not follow the harassment policy's instruction to report the harassment to the human resources department.

Aramark has a sexual harassment policy requiring employees to report any harassment to their supervisors immediately. Aramark contends the policy is printed in Aramark's employee handbook and posted in the employee's break room.[36] However, in contrast to *Harvill* and *Hockman*, the summary judgment record raises significant fact questions as to whether Murdock knew or should have known about the policy.

---

[36]    McConnell Aff. ¶ 3.

Murdock says she was unaware of Aramark's harassment policy.[37] She claims that she did not receive an employee manual at the beginning of her employment, although she signed a statement to the contrary.[38] The harassment policy contained in the record is a stand-alone document, not a page out of a larger employment manual.[39] Murdock did not sign the harassment policy to acknowledge that she received and understood it, even though the policy contains a signature page for that purpose. And there is no evidence that Murdock ever saw a copy of the policy in the break room.

Murdock's actions are consistent with lack of knowledge of the policy. As noted earlier, on the fourth day of her employment at the convention center, Murdock asked a police officer how to go about filing a harassment complaint. Murdock also testified that before filing a complaint she had asked Carolyn Cox, another Aramark housekeeper, how to file a harassment complaint, and Cox had told her to file a complaint with the City.[40] There is a fact question as to whether Aramark properly informed Murdock of the procedures for reporting harassment.

Even if Murdock had been aware of the policy, there is a fact question whether Murdock "unreasonably fail[ed] to take advantage of corrective opportunities." *See Harville*,

---

[37]     Murdock Depo. 173–174.

[38]     Murdock Depo 53; Dkts. 17-4, at 6; 18-2, at 26. She did eventually receive one in November of 2007, after she complained about Evans's harassment, and signed another acknowledgment. Murdock depo. 54–55; Dkts. 17-4, at 7; 18-2, at 27.

[39]     Dkt. 17-4, at 9.

[40]     *Id.* 109–111.

433 F.3d at 437. Murdock repeatedly attempted to contact her supervisor Hernandez, but could not get in touch with her. Given the factual disputes on the issue of prompt remedial action, the court concludes that Aramark is not entitled to summary judgment on this claim.

## Conclusion

For the foregoing reasons, the court recommends that Aramark Sports Facilities, L.L.C.'s motion for summary judgment (Dkt. 17) be denied, and that the City of Houston's summary judgment motion (Dkt. 18) be granted.

The parties have 14 days from service of this Memorandum and Recommendation to file written objections. Failure to timely file objections will preclude appellate review of factual findings or legal conclusions, except for plain error. Fed. R. Civ. P. 72.

Signed at Houston, Texas on September 21, 2011.

Stephen Wm Smith
United States Magistrate Judge